FILED'06 JAN 26 15:13USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ROBERT JOHNSON, | ) |
| Petitioner, | ) Civil No. 04-406-TC |
| v. | ) FINDINGS AND |
| | ) RECOMMENDATION |
| JEAN HILL, | ) |
| Respondent. | ) |

COFFIN, Magistrate Judge.

Presently before the court is the petition for habeas corpus relief (#2).

## BACKGROUND

At the age of seventeen, petitioner engaged in non-consensual sexual contact with a thirteen-year-old boy while the two were traveling back to the St. Mary's Home for Boys, where they were both residents. After losing a motion to suppress incriminating statements he had made to St. Mary's counselors and a police investigator, petitioner entered a plea of guilty to one count of Sexual Abuse

1 - FINDINGS AND RECOMMENDATION

in the First Degree, believing that because he was a minor, he would be eligible for a "second look" sentence reduction after serving half his sentence.[1] Petitioner was then sentenced to 75 months imprisonment, to be followed by 120 months of post-prison supervision. Petitioner did not directly appeal his sentence.

Approximately eighteen months after his conviction and sentence, petitioner filed a state petition for post-conviction relief. The PCR court denied relief, the Oregon Court of Appeals affirmed, and the Oregon Supreme Court denied relief. The final appellate judgment issued on October 3, 2003.

On March 11, 2005, petitioner signed a petition for federal habeas corpus relief, in which he contends that his trial counsel's performance was ineffective, and violated petitioner's Sixth Amendment rights, when he made statements to petitioner that caused petitioner to believe that he would be eligible for "second look" sentence relief. Respondent now seeks dismissal of the petition on the basis that petitioner failed to file it within the one-year period provided by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

### APPLICABLE LAW ON AEDPA'S LIMITATIONS PERIOD

The relevant portion of AEDPA amended 28 U.S.C. § 2244(d), which now provides:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the Judgment of a State court. The limitation period shall run from the latest of -

    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[1]"Second look" sentence relief is available to juvenile offenders for certain categories of offenses, and authorizes the court to conditionally release an offender after the first half of his sentence has been served. See Or. Rev. Stat. 420A.203.

2 - FINDINGS AND RECOMMENDATION

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

## DISCUSSION

### I. Petitioner has not filed his petition within the period provided by AEDPA.

Petitioner's sentence was entered on November 25, 1998. Petitioner had until December 28, 1998 to directly appeal his conviction or sentence, but did not do so. Pursuant to 28 U.S.C. § 2244(d), petitioner had one year (i.e., 365 days) from that date, barring any statutorily-tolled time, to file a petition for federal habeas corpus review. His habeas petition was signed on March 11, 2004, 1900 days after the limitations period began to run. Of that 1900 days, 1233 days (the period between May 18, 2000 and October 3, 2003) were tolled while petitioner pursued state post-conviction relief, leaving 667 un-tolled days - 302 more than AEDPA allows for.

Petitioner concedes that the AEDPA limitations period applied to his petition, and does not contest that 667 days expired which were not subject to statutory tolling. However, petitioner argues that some of that time should be equitably tolled because of his infancy and due to mental

deficiencies he suffered during part of his period of incarceration.

A. **Applicable law on equitable tolling**

"Equitable tolling will not be available in most cases, as extensions of time will only be granted if 'extraordinary circumstances' beyond a prisoner's control make it impossible to file a petition on time." Gaston v. Palmer, 417 F.3d 1030, 1034 (9th Cir. 2005) (quoting Calderon v. United States Dist. Ct. for the Centr. Dist. of Cal. (Beeler), 128 F.3d 1283, 1288 (9th Cir. 1997)). Further, mental incompetency can justify equitable tolling of the ADEPA statute of limitations only if "a habeas petitioner's mental incompetence in fact caused him to fail to meet the AEDPA filing deadline." Laws v. Lamarque, 351 F.3d 919, 923 (9th Cir. 2003). A petitioner bears the burden of demonstrating that equitable tolling is appropriate. Gaston, 417 F.3d at 1034; Miranda v. Castro, 292 F.3d 1963, 1065 (9th Cir. 2002). Therefore, in examining petitioner's mental incompetence for equitable tolling purposes, petitioner must convince the court by a preponderance of the evidence that: (a) petitioner suffered, during the times in question, from a condition rendering him mentally incompetent; (b) that such condition made it impossible for him to file a timely petition; and (c) that the condition did, in fact, prevent his timely filing. In reviewing the evidence, a court may consider dates close to the dates that the AEDPA time limitation was running to determine a prisoner's mental competency on the dates that the limitations period was actually running. See Gaston, 417 F.3d at 1034-1035.

B. **Analysis in this case**

As a threshold matter, before considering petitioner's allegations of mental deficiencies, the court will consider issues surrounding petitioner's incompetence due to infancy.

When petitioner was first incarcerated, he was seventeen years of age; he remained a minor

4 - FINDINGS AND RECOMMENDATION

for 100 days following the date his conviction became final and the AEDPA clock started running. Petitioner argues that he the AEDPA period should be tolled for these 100 days, and for an additional year, pursuant to Oregon rules of civil procedure. Petitioner's argument is founded in Rule 11 of the Rules Governing Section 2254 Cases, which provides that, to the extent they are not inconsistent with the habeas statutes or rules, the Federal Rules of Civil Procedure may be applied to a habeas case. The Federal Rules of Civil Procedure, petitioner's chain of logic continues, provides that "[t]he capacity of an individual . . . to sue or be sued shall be determined by the law of the individual's domicile." FRCP 17(b). Petitioner's argument then concludes by noting that under Oregon law, some statutes of limitations are tolled until a minor comes of age, and may be tolled for as long as a year following his reaching the age of majority. For this principle, petitioner cites to Or. Rev. Stat. 12.160.[2]

The court does not agree with petitioner that Or. Rev. Stat. 12.160 applies to this action. At the outset, it is clear that Rule 11's provision for applying an FRCP to a habeas proceeding is inappropriate here. Rule 11, by its own terms, only applies where the proposed FRCP is not inconsistent with the habeas statutes or rules. Here, petitioner's suggestion that the court use FRCP 17(b) is a clear attempt to make an end-run around a habeas statute, 28 U.S.C. § 2254(d). Such is clearly prohibited. See, e.g., Pitchess v. Davis, 421 U.S. 482, 489 (1975) (holding that FRCP 60(b)

---

[2]Or. Rev. Stat. 12.160 provides that: "If, at the time the cause of action accrues, any person entitled to bring an action mentioned in ORS 12.010 to 12.050, 12.070 to 12.250 and 12.276 is within the age of 18 years or insane, the time of such disability shall not be a part of the time limited for the commencement of the action; but the period within which the action shall be brought shall not be extended more than five years by any such disability, nor shall it be extended in any case longer than one year after such disability ceases." The court notes that Or. Rev. Stats. 12.010 to 12.050, 12.070 to 12.250 and 12.276 do not appear to apply to collateral attacks on criminal convictions, but that an entirely different section of Oregon laws (Or. Rev. Stat. 138.510) deals with the time limitations of such actions.

5 - FINDINGS AND RECOMMENDATION

should not be applied in a habeas case when it would have the effect of altering the statutory exhaustion requirement of 28 U.S.C. § 2254). Further, Or. Rev. Stat. 12.160 does not appear to apply to collateral attack of a conviction; rather, that statute allows for a minor to have a statute of limitations tolled in other, specifically-delineated cases. Thus, even were the court to agree that FRCP 17(b) could apply to import state law for tolling purposes, Or. Rev. Stat. would not be that law, and the court is not aware of any analogous provisions in Oregon law that provides for tolling of collateral attacks on criminal convictions on the basis of age.

Finally, the court notes that neither party cited to any directly on-point caselaw in which a court had considered the issue of a minor's age in connection with an analysis of whether equitable tolling applied to forgive the untimely filing of a federal habeas petition.[3] Indeed, the only case the court was able to discover that specifically addressed the issue at all was an unpublished district court's rejection of a prisoner's argument that his age, mental condition, and inadequate access to a law library all provided a basis for equitable tolling. Ambers v. Cockrell, 2002 WL 1544703 (N.D. Tex. 2002). In that case, the court did not squarely address the issue of the prisoner's age, but denied the request for equitable tolling upon finding that none of the conditions the prisoner described met the Fifth Circuit's standard of "rare and exceptional circumstances" which would justify tolling. Id. at *2. By necessary implication, therefore, the court found that the prisoner's infancy was not a per se basis for tolling, but rather a condition, like any other, which must be evaluated against the equitable tolling standard for sufficiency. Under the circumstances presented in this case, this court

---

[3] This is perhaps unsurprising when one considers the length of time that it takes to conclude the requisite state post-conviction proceedings. It is likely far from typical that a state prisoner with a conviction lending itself to federal habeas review, and with exhausted claims ripe for such review, would be a minor for much of the time that the AEDPA clock is running.

agrees.[4] The appropriate analysis for determining whether petitioner is entitled to equitable tolling for any period during the running of the AEDPA clock is whether there were "extraordinary circumstances" beyond a prisoner's control which made it impossible to file a petition on time.

Petitioner concedes that he suffered no impediment during the 160-day period between October 3, 2003 (the date the appellate judgment was final) and March 11, 2004 (the date his federal habeas petition was filed). Thus, the court's analysis is focused on the 507-day period between December 28, 1998 and May 18, 2000. To make his petition timely, petitioner must prove by a preponderance of the evidence that for at least 302 of those days his mental deficiencies constituted an "extraordinary circumstance" beyond his control that made it impossible to file a petition on time.

Petitioner argues that during that period he suffered from post-traumatic stress syndrome, borderline personality disorder, Crohn's disease,[5] and "problems related to incarceration." Memorandum in Support (#25) at 16; Argument and Records (#22). The medical records provided also suggest that he suffered from depression. However, the mere existence of these conditions is not sufficient to satisfy the equitable tolling standard. See, e.g., United States v. Harris, 268 F.Supp.2d 500 (E.D. Pa. 2003) (post-traumatic stress disorder insufficient to warrant tolling); Rhodes v. Senkowski, 82 F.Supp.2d 160 (S.D.N.Y. 1999) (depression insufficient to warrant tolling); Boyd v. Gillis, 2004 WL 2397296, *3 (E.D. Pa. 2004) ("Depression has been found to be a common fact of prison life and is, without more, insufficient to justify equitable tolling."). Rather,

---

[4] As described above, this issue is not well fleshed out in the caselaw. In an appropriate case, the court would be more inclined to consider whether infancy, standing alone, might provide a basis for equitable tolling. In this case, however, the 100 days petitioner might get tolled as a result of such analysis would be insufficient to make his claims timely in any event. As such, the court need not make a more detailed inquiry into the issue.

[5] Crohn's disease is an intestinal disorder which can cause pain and diarrhea.

7 - FINDINGS AND RECOMMENDATION

petitioner needs to demonstrate that the conditions made it impossible for him to file his petition on time. This he has not done.

Although petitioner clearly suffered from mental health issues at various times, ranging from his diagnosed issues as described above to possible suicidal activity,[6] the balance of the evidence suggests that petitioner was quite capable of staying on top of his legal issues and preparing or assisting in the preparation of legal documents. Petitioner was evaluated on multiple occasions, often as a result of his admission to the Special Management Unit ("SMU") because of self-injurious acts or, on one occasion, as a result of sexual contact with another inmate. In these evaluations, petitioner was found to be in decent mental health. The following is a thumbnail sketch of petitioner's interactions with prison staff as it relates to his mental health.

On November 24, 1998, petitioner was admitted to the SMU and was found to be logical, alert, in good humor, and attentive. Corrections Records (#106) at 644-45, 680. While in the SMU, he did well with his behavior plan, was cooperative, and sang, laughed and joked with his fellow inmates. Corrections Records (#106) at 641, 651-52. He was discharged from the SMU on December 17, 1998.

On February 10, 1999, petitioner was readmitted to the SMU. On intake, he was described as pleasant, outgoing and cooperative. Corrections Records (#106) at 638. He denied suicidal thoughts, was alert, and displayed excellent concentration and attention. Corrections Records (#106) at 676. He was formally evaluated on February 12, 1999, and the psychiatrist conducting the

---

[6]The correctional staff, however, believed that his "suicidal" behavior was not indicative of true attempts to kill himself, but was self-injurious behavior designed to change his incarceration conditions or conducted for self-gratification. Corrections Records (#106) at 689. Petitioner essentially agreed with those evaluations on various occasions, and further evaluations reached similar conclusions. See, e.g., Corrections Records (#106) at 633, 638, 644, 676, 681.

8 - FINDINGS AND RECOMMENDATION

evaluation noted that his thought processes were logical and goal-oriented, that he displayed good affect with no symptoms of psychoses. Corrections Records (#106) at 633. However, the psychiatrist diagnosed petitioner with depressive disorder, severe personality disorder, and possible post-traumatic stress disorder. Corrections Records (#106) at 644. Nonetheless, petitioner was described as cheerful and cooperative while in the SMU. Corrections Records (#106) at 629, 631. Staff found no evidence of additional psychoses. Corrections Records (#106) at 676-77. He was discharged from the SMU on February 23, 1999.

Plaintiff was then placed at the Snake River Correctional Institution. On March 18, 1999, petitioner reported symptoms of anxiety and paranoia, stemming from his transfer to the adult facility.[7] Corrections Records (#106) at 624. For two weeks, petitioner reported feeling vulnerable, but was assessed as having normal thought processes, as being coherent, and as being goal-oriented. Corrections Records (#106) at 623-25. He specifically said he wanted to appeal the decision to send him to the adult institution. Corrections Records (#106) at 625. On April 1, 1999, petitioner reported that was feeling better since he had stopped taking his medication, and said he felt more relaxed and got along with his roommate. Corrections Records (#106) at 621.

On May 5, 1999, petitioner was admitted to the Challenge of Prison Experience ("COPE") program at the Eastern Oregon Correctional Institution, a program designed for offenders who are having difficulty dealing with prison life but who do not need the more intensive treatment provided by the SMU. The program is typically a six-month program; however, petitioner was removed from

---

[7]Prior to his transfer to SRCI, petitioner, when not in the SMU, was in the custody of the Oregon Youth Authority.

9 - FINDINGS AND RECOMMENDATION

the program on June 22, 1999, because of inappropriate and disruptive behavior.[8] Corrections Records (#106) at 656.

On May 19, 1999, petitioner was placed on suicide watch after making comments suggesting he might hurt himself. However, the watch was terminated two days later, after petitioner was observed to be cheerful and positive, repeatedly denying suicidal intent. Corrections Records (#106) at 142, 144, 611. Staff believed his statements were designed by petitioner to obtain a single cell. Corrections Records (#106) at 143, 614.

On July 7, 1999, petitioner reported further feelings of vulnerability. Corrections Records (#106) at 577. On July 19, 1999, he was again placed on suicide watch after threatening to kill himself. Corrections Records (#106) at 140, 607, 609. Once in segregation, petitioner did pull out three of his toenails, and made non-life-threatening cuts to himself with them. Corrections Records (#106) at 138, 139, 573, 608. The next day he was taken off suicide watch. Corrections Records (#106) at 139.

On September 9, 1999, petitioner was readmitted to the SMU for evaluation. He reported that he had voluntarily discontinued his medication, and no longer wanted to take them. Corrections Records (#106) at 571. He was pleasant and cooperative, and evaluated as having linear, logical, and goal-directed thought processes, although he also presented as slightly dysphoric. Corrections Records (#106) at 666. He was again diagnosed with depression (or possible bipolar disorder), post-traumatic stress disorder, and borderline personality disorder. Corrections Records (#106) at 666. Throughout his five-week stay in the SMU, petitioner was repeatedly seen to be cheerful,

---

[8] Petitioner had apparently engaged in sexual discussion that others had found offensive, and hat participated in oral sex with other inmates, although he claimed his participation was involuntary. Corrections Records (#106) at 656.

cooperative, and in good spirits, save for one encounter with a correctional officer who confronted him about having too many books in his room. Corrections Records (#106) at 562-568. He had been allowed essentially all SMU privileges, and had been assigned a job within the unit. On October 13, 1999, officials determined that petitioner was not then struggling with any PTSD issues, and on October 14, 1999, petitioner was discharged from the SMU. The following week, petitioner was re-admitted to the COPE program at EOCI. Corrections Records (#106) at 662.

On December 8, 1999, petitioner reported that he had stopped taking his medications because he wanted to feel better on his own. Corrections Records (#106) at 534. He reported feelings of paranoia regarding other inmates' behavior towards him, but he was allowed to discontinue his medications because of his unwillingness to take them. Id. The following week, petitioner was observed to be anxious and fearful, and stated that he was feeling depressed. Corrections Records (#106) at 604. He reported that he was afraid about his interactions with fellow inmates, but that his biggest fear was that he would be removed from the COPE program. Corrections Records (#106) at 134. On December 24, 1999, petitioner was moved into segregation due to depression, and he was put on his medications again. Corrections Records (#106) at 133, 603. Two weeks later he reported feeling better, Corrections Records (#106) at 533, although a few weeks after that he again self-reported feelings of depression. Corrections Records (#106) at 132. He denied feeling suicidal or self-injurious, however. Id.

On March 9, 2000, petitioner informed staff that he had again stopped taking his medication, because he wanted to manage his symptoms on his own. Corrections Records (#106) at 530. He was prescribed an anti-depressant which he commenced taking, and within a month reported an alleviation of his symptoms. Id.

11 - FINDINGS AND RECOMMENDATION

On April 24, 2000, petitioner was placed on suicide watch for two days, because he had stated that he wanted to "go off," meaning harm himself. Corrections Records (#106) at 555, 605. However, he noted that he was not contemplating suicide, and after he agreed not to harm himself, he was taken off suicide watch. Corrections Records (#106) at 554.

Taken as a whole, this record does not suggest that for 302 of the 507 days between December 28, 1998 and May 18, 2000 petitioner was incapacitated to such a degree as to make it impossible for him to timely file a petition for habeas corpus relief (or a state petition which would toll the federal clock). Rather, it shows that, although he had bouts of depression and potentially some suicidal thoughts, he was consistently evaluated as having a pleasant demeanor and being rational and logical. In line with the cases cited above, I do not accept that the mere existence of depression or other mental illness, without a demonstrated incapacity preventing the inmate from filing their petition, is sufficient to warrant equitable tolling. See, e.g., Harris, 268 F.Supp.2d at 506 (finding that a "mental condition that burdens but does not prevent a prisoner from filing a timely petition does not constitute 'extraordinary circumstances' justifying equitable tolling."). Because petitioner has not demonstrated that his medical or mental conditions prevented him from doing so, his equitable tolling argument must fail, and his petition should be dismissed for failure to file within the limitations period prescribed by AEDPA.

///

///

///

///

///

12 - FINDINGS AND RECOMMENDATION

## CONCLUSION

For the above-stated reasons, the petition for habeas corpus relief should be dismissed.

DATED this 26 day of January, 2006.

_____
Thomas M. Coffin
United States Magistrate Judge